IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

NISSAN MOTOR ACCEPTANCE          *
CORPORATION,
                                 *
     Plaintiff,
                                 *
vs.                                   CASE NO. 4:10-CV-111 (CDL)
                                 *
SOWEGA MOTORS INC., ROBERT W.
DOLL and SANDRA W. DOLL,          *

     Defendants.                 *
_____

O R D E R

     In  this  action,  Plaintiff  Nissan  Motor  Acceptance
Corporation  ("NMAC")  seeks  to  enforce  personal  guaranties  made
by  Defendant  Robert  W.  Doll  ("Mr.  Doll")  in  connection  with
NMAC's  loans  to  Mr.  Doll's  car  dealership  businesses.  NMAC  also
alleges  that  Mr.  Doll  fraudulently  transferred  certain  property
to  his  wife,  Defendant  Sandra  W.  Doll  ("Mrs.  Doll"),  in  order  to
keep  NMAC  from  collecting  sums  due  under  the  loan  agreements.
NMAC  contends  that  there  is  no  genuine  fact  dispute  that  Mr.
Doll  is  liable  to  NMAC  based  on  the  personal  guaranties.  NMAC
also  asserts  that  there  is  no  genuine  fact  dispute  that  Mr.  Doll
fraudulently  transferred  certain  property  to  Mrs.  Doll.
Finally,  NMAC  argues  that  Mr.  Doll's  counterclaims  against  it
fail  as  a  matter  of  law.  As  discussed  below,  NMAC's  Motion  for
Summary  Judgment  (ECF  No.  55)  is  granted  in  part  and  denied  in

part.  The Court concludes that NMAC established as a matter of law that Mr. Doll is liable to NMAC based on the personal guaranties.  NMAC also established that Mr. Doll's counterclaims against it fail as a matter of law.  A genuine fact dispute, however, exists as to NMAC's fraudulent transfer claim, and NMAC's summary judgment motion as to that claim is denied.

## SUMMARY JUDGMENT STANDARD

Summary judgment may be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In determining whether a *genuine* dispute of *material* fact exists to defeat a motion for summary judgment, the evidence is viewed in the light most favorable to the party opposing summary judgment, drawing all justifiable inferences in the opposing party's favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  A fact is *material* if it is relevant or necessary to the outcome of the suit.  *Id.* at 248.  A factual dispute is *genuine* if the evidence would allow a reasonable jury to return a verdict for the nonmoving party.  *Id.*

## DEFENDANTS' OBJECTION TO BROOKS AFFIDAVIT

Before the Court recounts the evidence viewed in the light most favorable to Mr. and Mrs. Doll ("Defendants"), the Court must determine whether it may rely on the affidavit of Randy Brooks ("Brooks"), which NMAC submitted in support of its

summary judgment motion.  Defendants argue that certain portions of the affidavit are inadmissible.  Under Federal Rule of Civil Procedure 56(c)(4), an affidavit used to support a summary judgment motion "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated."

Defendants first argue that the Court should ignore Brooks's affidavit testimony that NMAC is a wholly-owned subsidiary of Nissan North America, Inc. ("NNA") and is a separate and distinct legal entity from NNA.  Pl.'s Mot. for Summ. J. Attach. 3, Brooks Aff. ¶ 5, ECF No. 55-3.  Defendants contend that the affidavit does not contain a sufficient basis for the Court to conclude that Brooks has personal knowledge of these facts.  In the affidavit, Brooks states that he is employed in the Special Credit Division of NMAC.  *Id.* ¶ 2.  He states that the affidavit is based on his personal knowledge and his review of certain NMAC business records.  *Id.* ¶ 3.  Brooks provides a basic corporate overview of NMAC and NNA, stating that both are California corporations, that they are separate legal entities, that NMAC provided certain financing for car dealerships owned by or previously owned by Mr. Doll, and that NNA previously maintained a franchisor/franchisee relationship with Mr. Doll.  *Id.* ¶¶ 4-7.  Based on Brooks's representation that he is an employee of NMAC and his representation that his

affidavit is based on personal knowledge and a review of certain NMAC business records, the Court may rely on Brooks's affidavit with regard to the corporate structure of NMAC and NNA.

Defendants also assert that the Court should ignore Brooks's affidavit testimony regarding certain account balances allegedly owed to NMAC by Mr. Doll and several of his companies under promissory notes and related guaranties, as well as amounts due to NMAC for certain contractor expenses. Citing *Taquechel v. Chattahoochee Bank*, 260 Ga. 755, 756, 400 S.E.2d 8, 9 (1991), Defendants argue that the affidavit is insufficient because NMAC failed to attach "account statements" to the affidavit. Defs.' Resp. to Pl.'s Mot. for Summ. J. 4, ECF No. 58. Even if *Taquechel* were applicable to this federal evidentiary issue, it does not stand for the proposition that "account statements" must be attached in support of an affidavit regarding outstanding loan balances. It stands for the proposition that an affidavit is insufficient if records relied on and referred to in the affidavit are not attached to the affidavit or included in the record. *Taquechel*, 260 Ga. at 756, 400 S.E.2d at 9. Here, Brooks relied on NMAC business records such as monthly dealer statements in support of his testimony, and he attached those business records to his affidavit. *E.g.*, Brooks Aff. Ex. E, Monthly Summaries, ECF No. 55-3 at 33-45. Brooks states that the business records were prepared in the

ordinary course of NMAC's business and that the transactions and events reflected in the records were documented by NMAC at or near the time they occurred pursuant to NMAC's regularly conducted business activities. Brooks Aff. ¶ 13. The Court is therefore satisfied that Brooks's affidavit is properly supported by business records that are admissible under Federal Rule of Evidence 803(6).

Defendants also appear to argue that the Court should disregard Brooks's affidavit regarding certain expenses and outstanding balances because Brooks does not explain how he derived the totals and does not explain why certain expenses were necessary. The Court rejects this argument. Brooks does explain generally how he calculated the outstanding balances, *e.g.* Brooks Aff. ¶ 19, and he did explain the contractor expenses, *id.* ¶¶ 25-28.[1] The Court therefore declines to disregard Brooks's affidavit testimony regarding outstanding balances and contractor expenses.

FACTUAL BACKGROUND

The following facts are undisputed for purposes of NMAC's summary judgment motion.

Mr. Doll is the sole shareholder of Doll & Doll Motor Company ("Rob Doll Nissan") and RWD Real Estate, LLC ("RWD Real

---

[1] If Defendants wished to obtain more detail about NMAC's damages calculations, Defendants could have taken the deposition of a NMAC corporate representative pursuant to Federal Rule of Civil Procedure 30(b)(6) during discovery.

Estate"), and he is the owner of Sowega Motors, Inc. ("Sowega Motors").

I.   **The Loans and Guaranties**

Rob Doll Nissan entered a floorplan financing agreement with NMAC ("Doll & Doll Floorplan").  Under the Doll & Doll Floorplan, NMAC periodically advanced funds to Rob Doll Nissan for the purchase of vehicle inventory for the Rob Doll Nissan dealership in Columbus, Georgia.  The Doll & Doll Floorplan provided that if there was a default, then Rob Doll Nissan "shall pay all costs and expenses, including NMAC's attorneys fees" in connection with locating and taking possession of collateral, collecting amounts due under the Doll & Doll Floorplan, and enforcing NMAC's rights under the Doll & Doll Floorplan.  Brooks Aff. Ex. F, Doll & Doll Floorplan ¶ 5.2, ECF No. 55-3 at 49-50.

Sowega Motors entered a floorplan financing agreement with NMAC ("Sowega Floorplan").  Under the Sowega Floorplan, NMAC periodically advanced funds to Sowega Motors for the purchase of vehicle inventory for Mr. Doll's General Motors dealership in Americus, Georgia.  The Sowega Floorplan provided that if there was a default, then Sowega Motors "shall pay all costs and expenses, including NMAC's attorneys['] fees" in connection with locating and taking possession of collateral, collecting amounts due under the Sowega Floorplan, and enforcing NMAC's rights

under the Sowega Floorplan.  Brooks Aff. Ex. A, Sowega Floorplan ¶ 5.3, ECF No. 55-3 at 13.

RWD Real Estate entered into a $9 million loan with NMAC ("RWD Note").  RWD Real Estate planned to use the loan to construct a new dealership facility for Rob Doll Nissan's business operations in Columbus, Georgia.  The RWD Note provided that RWD Real Estate shall pay "fees and out-of-pocket expenses of any legal counsel" in connection with "enforcement or attempted enforcement" of the RWD Note.  Brooks Aff. Ex. H, RWD Note ¶ 6.8, ECF No. 55-3 at 79.

In a Cross-Guaranty, Cross-Collateral and Cross-Default Agreement dated September 15, 2008, Rob Doll Nissan guaranteed all liabilities and obligations of RWD Real Estate and Sowega Motors to NMAC.  *See generally* Brooks Aff. Ex. N, Cross-Guaranty, Cross-Collateral and Cross-Default Agreement, ECF No. 55-3 at 132-43.  In the same agreement, RWD Real Estate guaranteed all liabilities and obligations of Rob Doll Nissan and Sowega Motors to NMAC, and Sowega Motors guaranteed all liabilities and obligations of Rob Doll Nissan and RWD Real Estate to NMAC.  In addition, Mr. Doll personally guaranteed all liabilities and obligations of Rob Doll Nissan, RWD Real Estate and Sowega Motors to NMAC.

## II.  The Defaults

### A.  Rob Doll Nissan

Rob Doll Nissan defaulted on its payment obligations to NMAC under the Doll & Doll Floorplan by failing to make payments when due.  On April 23, 2009, NMAC notified Rob Doll Nissan of its default and of NMAC's intention to enforce its rights and remedies under the Doll & Doll Floorplan.  NMAC again notified Rob Doll Nissan of its default and of NMAC's intention to enforce its rights and remedies under the Doll & Doll Floorplan on April 29, 2009.  According to Mr. Doll, however, the April 2009 default was due to a bookkeeper's mistake and was quickly corrected.  Doll Dep. 88:16-89:8, ECF No. 54.

Mr. Doll, individually and on behalf of Rob Doll Nissan, RWD Real Estate and Sowega Motors, executed a forbearance agreement with NMAC on June 5, 2009.  In the forbearance agreement, Rob Doll Nissan and Mr. Doll acknowledged that Rob Doll Nissan had defaulted on the Doll & Doll Floorplan.  NMAC's counsel sent Mr. Doll another notice of default on June 18, 2009.  As a result of the default, NMAC suspended all financing to Rob Doll Nissan and accelerated the outstanding balance of the Doll & Doll Floorplan.

Based on NMAC's calculations, the outstanding balance due to NMAC under the Doll & Doll Floorplan is $71,746.18.  Brooks Aff. ¶ 19.  This amount includes $51,940.89 in outstanding

principal   and   $19,805.29   in   interest   ($14,017.88   through
September 20, 2010 and $5,787.41 for September 21, 2010 to April
27, 2012).   *Id.*   Though Mr. Doll contends that NMAC has not
adequately established the amount due under the Doll & Doll
Floorplan, Mr. Doll did not point to any evidence to controvert
NMAC's evidence on this point.

As a result of the default on the Doll & Doll Floorplan,
NMAC hired an independent contractor to locate, monitor and
protect NMAC's interest in Rob Doll Nissan's vehicle inventory.
As discussed in more detail below, Sowega Motors also defaulted
on its obligations to NMAC, and NMAC hired an independent
contractor to safeguard NMAC's collateral at the Sowega Motors
dealership site.   NMAC incurred more than $83,200.00 to pay the
contractors to safeguard the collateral at the Rob Doll Nissan
dealership site and the Sowega Motors dealership site.   Brooks
Aff. ¶ 26.   Mr. Doll did not point to any evidence to controvert
NMAC's evidence regarding the contractor expenses.

B.   Sowega Motors

Sowega Motors defaulted on the Sowega Floorplan in April
2009.[2]   NMAC notified Sowega Motors of its default and of NMAC's
intention to enforce its rights and remedies under the Sowega
Floorplan on April 23, 2009.   On April 29, 2009, NMAC again

---

[2] Mr. Doll contends that Sowega Motors did not default on the Sowega
Floorplan in April 2009, but the evidence he cited in support of this
proposition does not actually support it.

notified Sowega Motors of its default and of NMAC's intention to enforce its rights and remedies under the Sowega Floorplan. General Motors terminated the franchise of Sowega Motors, and the parties entered into a wind-down agreement on June 1, 2009.

As discussed above, Mr. Doll, individually and on behalf of Rob Doll Nissan, RWD Real Estate and Sowega Motors, executed a forbearance agreement with NMAC on June 5, 2009. In the forbearance agreement, Sowega Motors and Mr. Doll acknowledged the defaults on the Sowega Floorplan. Sowega Motors defaulted again later in June 2009, and NMAC's counsel sent Mr. Doll a notice of default on June 18, 2009. As a result of the default, NMAC suspended all financing to Sowega Motors and accelerated the outstanding balance of the Sowega Floorplan.

NMAC repossessed all remaining vehicle inventory by consent in September 2009. NMAC later obtained a deficiency judgment against Sowega Motors by default for more than $2.6 million. Around the same time that NMAC repossessed the remaining vehicle inventory, Sowega Motors surrendered its real estate to its mortgage lender.

Based on NMAC's calculations, the outstanding balance due to NMAC under the Sowega Floorplan is $277,125.16. Brooks Aff. ¶ 13. This amount includes $203,601.07 in outstanding principal and $73,524.09 in interest ($53,673.28 through September 20, 2010 and $19,850.81 for September 21, 2010 to April 27, 2012).

*Id.*   Though Mr. Doll contends that NMAC has not adequately established the amount due under the Sowega Floorplan, Mr. Doll did not point to any evidence to controvert NMAC's evidence on this point.

### C.   RWD Real Estate

RWD Real Estate defaulted on the RWD Note by failing to make payments when due.  NMAC notified RWD Real Estate of its default and NMAC's intention to enforce its rights and remedies under the RWD Note on April 23, 2009.  On April 29, 2009, NMAC again notified RWD Real Estate of its default and NMAC's intention to enforce its rights and remedies under the RWD Note.

As discussed above, Mr. Doll, individually and on behalf of Rob Doll Nissan, RWD Real Estate and Sowega Motors, executed a forbearance agreement with NMAC on June 5, 2009.  In the forbearance agreement, RWD Real Estate and Mr. Doll acknowledged the defaults on the RWD Note.

Based on NMAC's calculations, the outstanding balance due to NMAC under the RWD Note is $864,569.32.  Brooks Aff. ¶ 24. This amount includes $591,546.59 in outstanding principal and $ $273,022.73 in interest ($250,114.49 through November 30, 2010 and $22,908.24 for December 1, 2010 to April 27, 2012).  *Id.* Though Mr. Doll contends that NMAC has not adequately established the amount due under the RWD Note, Mr. Doll did not

point to any evidence to controvert NMAC's evidence on this point.

### III. Mr. Doll's Personal Guaranties and Financial Background

In a Cross-Guaranty, Cross-Collateral and Cross-Default Agreement dated July 9, 2008 ("First Guaranty"), Mr. Doll personally guaranteed all of the liabilities and obligations of Rob Doll Nissan, RWD Real Estate and Sowega Motors to NMAC. NMAC never agreed to modify, waive or release Mr. Doll from any provisions of the First Guaranty.[3]  Brooks Aff. ¶ 30.  Mr. Doll later executed a Continuing Guaranty Agreement in favor of NMAC ("Second Guaranty").  NMAC never agreed to modify, waive or release Mr. Doll from any provisions of the Second Guaranty. *Id.* ¶ 31.[4]  Mr. Doll also executed a Payment Guaranty in favor of NMAC ("Third Guaranty").  NMAC never agreed to modify, waive or release Mr. Doll from any provisions of the Third Guaranty. *Id.* ¶ 32.[5]  Finally, as discussed above, Mr. Doll executed a Cross-Guaranty, Cross-Collateral and Cross-Default Agreement dated September 15, 2008 ("Fourth Guaranty"), in which Mr. Doll personally guaranteed all of the liabilities and obligations of Rob Doll Nissan, RWD Real Estate and Sowega Motors to NMAC.

---

[3] Mr. Doll denies this fact but did not point to any evidence to controvert it.
[4] Mr. Doll denies this fact but did not point to any evidence to controvert it.
[5] Mr. Doll denies this fact but did not point to any evidence to controvert it.

NMAC never agreed to modify, waive or release Mr. Doll from any provisions of the Fourth Guaranty. *Id.* ¶ 33.[6]

In May or June of 2009, Mr. Doll solicited investors for Rob Doll Nissan, seeking to raise $1.5 million for Rob Doll Nissan. Nonetheless, it is undisputed that the financial outlook for Mr. Doll's businesses became bleak by mid-summer 2009; by August 2009, Mr. Doll admitted that his businesses were struggling. It is also undisputed that by the fall of 2009 Rob Doll Nissan and RWD Real Estate were in bankruptcy. By late 2009, Mr. Doll had lost his investments in these businesses and several others, including Sowega Motors. And in 2010, Mr. Doll lost his personal residence.

## IV.  Real Estate Transfers from Mr. Doll to Mrs. Doll

Mr. Doll transferred three parcels of real estate to Mrs. Doll on April 30, 2009. All three properties were unencumbered at the time of the transfers to Mrs. Doll. According to Mr. and Mrs. Doll, the transfers were based on an estate-planning recommendation from their estate-planning attorney. *See, e.g.,* Doll Dep. Ex. 13, Letter from C. Cheves to R. Doll (June 4, 2009), ECF No. 54-2 at 8 (stating that transfer was pursuant to 2008 estate planning discussion between Mr. and Mrs. Doll and their attorney).

---

[6] Mr. Doll denies this fact but did not point to any evidence to controvert it.

The first parcel was a single family home located at 502 Gulf Boulevard in Panama City Beach, Florida ("Gulf Boulevard property"). The Gulf Boulevard property had a tax-assessed value of $195,597 in 2009 and a tax-assessed value of $175,000 in 2011. Mr. and Mrs. Doll agree that the Gulf Boulevard property was worth at least $115,000 in April 2009, and Mr. Doll believed that the property was worth $500,000 in 2007. Mr. Doll voluntarily conveyed his interest in the Gulf Boulevard property to Mrs. Doll on April 30, 2009. He did not receive any monetary consideration in return.

The second parcel was a four-acre real estate parcel located at 27555 Bonita Grand Drive in Bonita Springs, Florida ("Bonita Grand Drive property"). Mr. Doll purchased the Bonita Grand Drive property from his parents in November 2006 for $56,000. He believed that the property was worth $2 million in 2007 and represented to NMAC that the property was worth as much as $2 million. The Bonita Grand Drive property had a tax-assessed value of $138,600 in 2008 and a tax-assessed value of $39,600 in 2009. Mr. Doll voluntarily conveyed his interest in the Bonita Grand Drive property to Mrs. Doll on April 30, 2009. He did not receive any monetary consideration in return.

The third parcel was a 75' x 120' real estate parcel located at 127 13th Street in Bay County, Florida ("13th Street property"). The 13th Street property had a tax-assessed value

of $129,200 in 2009 and currently has a tax-assessed value of $83,400.  Mr. Doll believed that the 13th Street Property was worth $500,000 in 2007.  Mr. Doll voluntarily conveyed his interest in the 13th Street property to Mrs. Doll on April 30, 2009.  He did not receive any monetary consideration in return.

**V.   NMAC's Claims Against Defendants**

NMAC asserts three claims against Mr. Doll to enforce the personal guaranties he made with regard to loans NMAC made to Mr. Doll's businesses.  First, NMAC seeks enforcement of the Sowega Floorplan against Mr. Doll.  Second, NMAC seeks enforcement of the Doll & Doll Floorplan against Mr. Doll. Third, NMAC seeks enforcement of the RWD Note against Mr. Doll.

NMAC also asserts three claims against Mr. and Mrs. Doll for fraudulent transfer.  First, NMAC alleges that Mr. Doll fraudulently transferred the Gulf Boulevard property to Mrs. Doll.  Second, NMAC alleges that Mr. Doll fraudulently transferred the Bonita Grand Drive property to Mrs. Doll. Third, NMAC alleges that Mr. Doll fraudulently transferred the 13th Street property to Mrs. Doll.

**VI.  Mr. Doll's Counterclaims**

Mr. Doll asserts two counterclaims.  First, Mr. Doll asserts a counterclaim against NMAC arising from its alleged failure to perform a verbal promise to fund the entirety of the construction costs for Mr. Doll's new dealership facility in

north Columbus.   Second, Mr. Doll alleges that NNA treated him prejudicially by demanding that he move Rob Doll Nissan to north Columbus.

DISCUSSION

## I.   Enforcement of Guaranties

To prevail on its claim for enforcement of the guaranties, NMAC must prove that the loans and guaranty agreements were duly executed and that the loans are in default.   *E.g., Big Sandy P'ship, LLC v. Branch Banking & Trust Co.*, 313 Ga. App. 871, 871-72, 723 S.E.2d 82, 84 (2012).   If NMAC establishes that the loans and guaranty agreements were duly executed by Mr. Doll and that the loans were in default, NMAC has established "a prima facie right to judgment as a matter of law," and the burden of production shifts to Mr. Doll to establish any affirmative defenses.   *Id.*

Mr. Doll contends that NMAC cannot prevail at summary judgment without piercing each affirmative defense he pled in his Answer.   As discussed above, however, it is Mr. Doll's burden to establish his affirmative defenses at this stage in the litigation.   Although Mr. Doll need not establish them as a matter of law at this stage in the litigation, he must point to sufficient facts in support of those defenses to create a genuine factual dispute.   *E.g., Johnson v. Bd. of Regents of Univ. of Ga.*, 263 F.3d 1234, 1264 (11th Cir. 2001) (noting that

16

defendant has burden to adduce evidence supporting affirmative defenses and that summary judgment movant does not have burden to negate their existence); *accord Big Sandy P'ship, LLC*, 313 Ga. App. at 872, 723 S.E.2d at 84 (stating that where lender established prima facie right to judgment as a matter of law based on debtors' default on promissory notes, debtors "were not entitled to rest on allegations in their pleadings to establish affirmative defenses on which they had the burden of proof at trial, but were required to come forward with or point to specific facts in the record to establish affirmative defenses"). Mr. Doll pointed to no evidence in support of his affirmative defenses. As explained below, NMAC has established that the loans and guaranty agreements were duly executed by Mr. Doll and were in default. Therefore, NMAC is entitled to judgment as a matter of law on these claims.

> A.   Doll & Doll Floorplan

It is undisputed that Mr. Doll personally guaranteed all of the liabilities and obligations of Rob Doll Nissan, including the Doll & Doll Floorplan. While Mr. Doll disputes that Rob Doll Nissan was in default as of April 2009, there is no fact dispute that Mr. Doll acknowledged Rob Doll Nissan's default by June 2009. Therefore, NMAC may enforce the guaranties against Mr. Doll. The remaining question is the amount due. NMAC's evidence establishes that the outstanding balance due under the

Doll & Doll Floorplan is $71,746.18.   Brooks Aff. ¶ 19.   Mr.
Doll pointed to no evidence to create a genuine fact dispute as
to this amount.   Therefore, NMAC is entitled to recover
$71,746.18 based on the default under the Doll & Doll Floorplan.

In addition, NMAC is entitled to attorney's fees based on
the attorney's fees provision in the Doll & Doll Floorplan.
Under O.C.G.A. § 13-1-11, "obligations to pay attorney's fees
upon any note or other evidence of indebtedness shall be valid
and enforceable."[7]   *Pac. Mut. Life Ins. Co. v. Wise*, 878 F.2d
1398, 1399 (11th Cir. 1989) (per curiam).   Where, as here, the
note or other evidence of indebtedness provides for a payment of
attorney's fees without specifying a percent, the statute
provides a mathematical formula for calculating the amount: "15
percent of the first $500.00 of principal and interest owing on
such note or other evidence of indebtedness and 10 percent of
the amount of principal and interest owing thereon in excess of
$500.00".   O.C.G.A. § 13-1-11(a)(2); *accord Wise*, 878 F.2d at
1400.   Based on the formula in O.C.G.A. § 13-1-11(a)(2), the
attorney's fee for enforcement of the Doll & Doll Floorplan is

---

[7] Mr. Doll argues that the attorney's fees provision in the Doll & Doll
Floorplan does not fall within the purview of O.C.G.A. § 13-1-11
because the Doll & Doll Floorplan does not use the word "reasonable"
to describe the amount of recoverable attorney's fees.   Mr. Doll has
pointed to no authority in support of his theory that an attorney's
fees provision in a note or other evidence of indebtedness must
contain the word "reasonable" in order to trigger O.C.G.A. § 13-1-11,
and the Court rejects this argument.

$7,199.62.  Therefore, the total amount due to NMAC under the Doll & Doll Floorplan is $78,945.80.

B.   Post-Default Contractor Expenses

NMAC incurred more than $83,200.00 to pay the contractors to safeguard the collateral at the Rob Doll Nissan dealership site and the Sowega Motors dealership site.  It is undisputed that the Doll & Doll Floorplan and the Sowega Floorplan make the dealerships responsible for such expenses, and Mr. Doll did not point to any evidence to controvert NMAC's evidence regarding the amount of contractor expenses.  NMAC is therefore entitled to recover the $83,200.00 it claims in contractor expenses.

C.   Sowega Floorplan

It is undisputed that Mr. Doll personally guaranteed all of the liabilities and obligations of Sowega Motors, including the Sowega Floorplan.  It is also undisputed that Sowega Motors defaulted on the Sowega Floorplan in April 2009, that Mr. Doll acknowledged the default in June 2009, and that Sowega Motors defaulted again in June 2009.  Therefore, there is no genuine fact dispute that Sowega Motors was in default by June 2009, and NMAC may enforce the guaranties against Mr. Doll.  The remaining question is the amount due.  NMAC's evidence establishes that the outstanding balance due under the Sowega Floorplan is $277,125.16.  Brooks Aff. ¶ 13.  Mr. Doll pointed to no evidence to create a genuine fact dispute as to this amount.  Therefore,

NMAC is entitled to recover $277,125.16 based on the defaults under the Sowega Floorplan.

In addition, NMAC is entitled to attorney's fees based on the attorney's fees provision in the Sowega Floorplan. Based on the formula in O.C.G.A. § 13-1-11(a)(2), the attorney's fee for enforcement of the Sowega Floorplan is $27,737.52.[8] Therefore, the total amount due to NMAC under the Sowega Floorplan is $304,862.68.

D.   RWD Loan

It is undisputed that Mr. Doll personally guaranteed all of the liabilities and obligations of RWD Real Estate, including the RWD Note. It is also undisputed that RWD Real Estate defaulted on the RWD Note in April 2009 and that Mr. Doll acknowledged the default in June 2009. Therefore, NMAC may enforce the guaranties against Mr. Doll. The remaining question is the amount due. NMAC's evidence establishes that the outstanding balance due under the RWD Note is $591,546.59. Brooks Aff. ¶ 24. Mr. Doll pointed to no evidence to create a genuine fact dispute as to this amount. Therefore, NMAC is

---

[8] The Court notes that, perhaps in response to cases like *Wise*, where O.C.G.A. § 13-1-11 allowed "unconscionably high fees," *Wise*, 878 F.2d at 1399, the Georgia legislature recently enacted a provision under which a debtor may challenge the amount of statutory attorney's fees. If application of O.C.G.A. § 13-1-11(a)(2) "will result in an award of attorney's fees in an amount greater than $20,000.00, the party required to pay such fees may, prior to the entry of judgment, petition the court seeking a determination as to the reasonableness of such attorney's fees." O.C.G.A. § 13-1-11(b)(1).

entitled to recover $864,569.32 based on the default under the RWD Note.

In addition, NMAC is entitled to attorney's fees based on the attorney's fees provision in the RWD Note. Based on the formula in O.C.G.A. § 13-1-11(a)(2), the attorney's fee for enforcement of the RWD Note is $86,481.93. Therefore, the total amount due to NMAC under the RWD Note is $951,051.25.

## II.  Fraudulent Transfers

NMAC also brings claims against Mr. and Mrs. Doll for fraudulent transfer under Georgia's Uniform Fraudulent Transfers Act, O.C.G.A. §§ 18-2-70 to -80. Under the Uniform Fraudulent Transfers Act, a transfer made by a debtor is fraudulent as to a creditor if the debtor made the transfer:

> Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
>
> (A) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
>
> (B) Intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due.

O.C.G.A. § 18-2-74(a)(2). A transfer made by a debtor is also fraudulent as to a creditor "if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became

21

insolvent as a result of the transfer or obligation." O.C.G.A. § 18-2-75(a).

NMAC contends that the undisputed evidence shows that, as of April 30, 2009, Mr. Doll was engaged in businesses for which his remaining assets were unreasonably small in relation to those businesses and that Mr. Doll should have believed he would incur debts beyond his ability to pay them as they came due. NMAC also argues that the undisputed evidence shows that Mr. Doll was insolvent as of April 30, 2009.  Although the evidence certainly could support NMAC's contention, the Court finds that the evidence is not undisputed, particularly given the evidence of Mr. Doll's optimistic efforts to secure additional investors and shore up the financials of his businesses during the same approximate timeframe.  Reconciling these conflicting interpretations of the disputed evidence is a factually intensive exercise.  It is best left to a jury and not the Court as a matter of law.  Accordingly, NMAC's summary judgment motion as to its fraudulent transfer claims is denied.

## III. Mr. Doll's Counterclaims

### A.  Counterclaim Regarding Alleged Oral Promise by NMAC

In his Counterclaim, Mr. Doll alleges that NMAC had promised to provide "100% financing" for the new Rob Doll Nissan facility in north Columbus.  Answer & Countercl. 20 ¶ 16, ECF No. 12.  Mr. Doll further alleges that when the new building was

90% complete, Mr. Doll found out that NMAC's $9 million loan under the RWD Note was not enough to complete the building. *Id.* at 19 ¶ 10. Therefore, Mr. Doll in his Counterclaim appears to assert that NMAC breached an agreement to provide RWD Real Estate with 100% financing for the new construction project by only lending RWD Real Estate $9 million.

The RWD Note provided that NMAC would lend RWD Real Estate "up to" $9 million. Doll Dep. Ex. 7, RWD Note 1, ECF No. 54-1 at 19. The RWD Note contained a merger clause stating: "This Note and the other Loan Documents contain the entire agreement between Lender and Borrower in connection with the Loan and supersede all prior agreements and negotiations, whether written or oral." *Id.* ¶ 6.2, ECF No. 54-1 at 30. The RWD Note further provided: "This Note and the other Loan Documents may be amended only by a writing signed by Lender and each other party against whom enforcement of such amendment may be sought." *Id.* Mr. Doll did not point to any provision in the RWD Note under which NMAC promised to lend RWD Real Estate more than $9 million. Based on the merger clause, Mr. Doll cannot state a claim against NMAC for failing to honor an alleged promise that was not memorialized in the written agreement. *See, e.g.,* O.C.G.A. § 13-2-2(1) ("Parol evidence is inadmissible to add to, take from, or vary a written contract."); O.C.G.A. § 24-6-1

("Parol contemporaneous evidence is generally inadmissible to contradict or vary the terms of a valid written instrument.").

Perhaps to avoid the merger clause, Mr. Doll presented a different theory of his breach of contract claim in his response to NMAC's summary judgment motion.  Mr. Doll now asserts that when he discovered that the $9 million loan under the RWD Note was not sufficient to complete construction on the new dealership facility, NMAC's agent Al Jones "agreed to fund the $900,000 shortfall."  Defs.' Resp. to Pl.'s Mot. for Summ. J. 11, ECF No. 58 (citing Doll Dep. 149:12-19).  It is undisputed that Mr. Doll did not receive anything in writing from NMAC committing to fund more than the $9 million NMAC funded under the RWD Note.

At this stage in the litigation, the Court must accept as true Mr. Doll's statement that NMAC's agent agreed to provide the additional $900,000.  Mr. Doll, however, did not point to sufficient evidence of a breach of contract by NMAC with regard to the alleged $900,000 promise.  First, it is not entirely clear from Mr. Doll's testimony whether Mr. Jones promised the money to Rob Doll personally, to RWD Real Estate or to Rob Doll Nissan.  *See* Doll Dep. 149:15-19 ("Al Jones told me no problem, we'll get [$900,000].  We're not going to let you fail, Rob.  We can't afford that. Al Jones, quote, unquote.  Just we'll get you the money.").  Second, and more importantly, a critical element

of a breach of contract claim is the existence of a contract; to have a valid contract, "there must be parties able to contract, a consideration moving to the contract, the assent of the parties to the terms of the contract, and a subject matter upon which the contract can operate." O.C.G.A. § 13-3-1.  Mr. Doll pointed to no evidence of any consideration for the alleged $900,000 promise—a significant modification of the written contract.  Therefore, Mr. Doll's counterclaim based on the alleged $900,000 promise fails.

B.  <u>Counterclaim Regarding NNA's Alleged Prejudicial Treatment of Mr. Doll</u>

Mr. Doll also alleges that NNA treated Mr. Doll in a prejudicial manner by demanding that Mr. Doll move Rob Doll Nissan to another location in Columbus.  NMAC asserts that it is entitled to judgment as a matter of law on this counterclaim because it cannot be legally responsible for the alleged conduct of NNA.  Though Mr. Doll contends that NMAC has not shown that it is a separate entity from NNA, the undisputed evidence in the present record establishes that NMAC is a wholly-owned subsidiary of NNA and is a separate and distinct legal entity from its parent, NNA.  Brooks Aff. ¶ 5.  Mr. Doll has pointed to no evidence in support of his theory that NMAC and NNA are not separate and distinct legal entities.  He has also pointed to no reason why NNA's conduct should be attributed to NMAC.  For

these reasons, Mr. Doll's counterclaim against NMAC for NNA's conduct fails.

CONCLUSION

For the reasons set forth above, NMAC's summary judgment motion (ECF No. 55) is granted in part and denied in part.  A genuine fact dispute exists as to NMAC's fraudulent transfer claims, and NMAC's summary judgment motion as to those claims is denied.  The remainder of NMAC's motion is granted.  Mr. Doll's counterclaims fail as a matter of law and are therefore dismissed.  In addition, NMAC is entitled to enforcement of the guaranties made by Mr. Doll.  Based on the undisputed evidence, Mr. Doll is liable to NMAC in the following amounts:

| | |
|---|---|
| Sowega Floorplan | $304,862.68 |
| Doll & Doll Floorplan | $78,945.80 |
| Contractor Expenses | $83,200.00 |
| RWD Note | $951,051.25 |
| **Total** | **$1,418,059.73** |

IT IS SO ORDERED, this 11th day of September, 2012.

S/Clay D. Land
CLAY D. LAND
UNITED STATES DISTRICT JUDGE